# DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

**SEARCY DENNEY SCAROLA BARNHART & SHIPLEY, P.A.; MARK EDWARDS** and **MITZI DEE RODEN,** as parents and natural guardians of **AARON EDWARDS,** a minor**; WILLIAM S. FRATES, II, P.A.; EDNA L. CARUSO, P.A.; VAKA LAW GROUP, P.L.;** and **GROSSMAN & ROTH, P.A.,**
Appellants,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D13-3497

[July 15, 2015]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Martin H. Colin, Judge; L.T. Case No. 502012GA000558XX.

Christian D. Searcy and Jack P. Hill of Searcy Denney Scarola Barnhart & Shipley, P.A., West Palm Beach; George A. Vaka of Vaka, Larson & Johnson, P.L., Tampa; and Edna L. Caruso of Edna L. Caruso, P.A., West Palm Beach; for appellants.

Pamela Jo Bondi, Attorney General, Allen Winsor, Solicitor General, and Rachel Nordby, Deputy Solicitor General, Tallahassee, for appellee.

FORST, J.

Appellants Searcy Denney Scarola Barnhart & Shipley, P.A. ("Searcy Denney"), et al. appeal the refusal of the guardianship court to authorize payment of $2.5 million in attorneys' fees to the firms involved in the litigation of a medical malpractice lawsuit, the appeal, and a subsequent lobbying effort to secure a claims bill (also deemed a "private relief act") from the Legislature on behalf of Aaron Edwards and his parents. The legislative claims bill placed a limitation on the use of funds to pay legal fees and costs, and it is this limitation that is the subject of the instant appeal. Although sympathetic to Appellants' situation, we must disagree with their legal arguments based on separation of powers principles, supported by reasoning set forth from the Florida Supreme Court.

Accordingly, we affirm the order denying Appellants' motion for attorneys' fees above the $100,000 granted by the Legislature in Aaron's claims bill.

## I.     Background

In September 1997, Aaron Edwards ("Aaron") sustained a catastrophic brain injury during his birth as a result of negligence on the part of employees at Lee Memorial Health System.  Searcy Denney, a law firm based in West Palm Beach, began its representation of Aaron and his parents in 1999.  The law firm and the Edwards family entered into a standard contingency fee agreement, providing for an attorneys' fee of 40% of any recovery if a lawsuit was filed, plus costs.  The agreement also provided that "[i]n the event that one of the parties to pay my claim for damages is a governmental agency, I understand that Federal and Florida Law may limit the amount of attorney fees charged by [Searcy Denney, and i]n that event, I understand that the attorney fees owed to [Searcy Denney] shall be the amount provided by law."

Searcy Denney represented the family in a five-week jury trial in 2007. The jury found that Lee Memorial Health System's employees had been negligent and that their negligence had resulted in damages to Aaron and his parents.  The jury awarded Aaron over $28.3 million.  His mother was awarded $1,340,000 in damages, and his father was awarded $1,000,000. However, the trial court found that Lee Memorial was an independent special district of the State of Florida and, pursuant to the sovereign immunity damage limitations in section 768.28(5), Florida Statutes (2007), entered a judgment against the hospital in the amount of $200,000.[1]  The trial court rulings were affirmed by the Second District Court of Appeal. *Lee Mem'l Health Sys. v. Edwards*, 22 So. 3d 81 (Fla. 2d DCA 2009).

In an effort to obtain additional funds for Aaron and his parents, Searcy Denney submitted a claims bill to the Florida Legislature.  In 2012, after a public campaign in support of the bill, the Legislature passed Claims Bill 2012-249, directing Lee Memorial to appropriate $10 million, with an additional $5 million payable in annual installments, "to the Guardianship of Aaron Edwards, to be placed in a special needs trust for the exclusive use and benefit of Aaron Edwards, a minor."  Ch. 2012-249, § 2, Laws of Fla.  No monies were appropriated for the use and/or benefit of either parent for their damages.  The claims bill also included a stipulation stating "[t]he total amount paid for attorney's fees, lobbying fees, costs, and other similar expenses relating to this claim may not exceed

---

[1] The entire $200,000 was applied to partially reimburse Searcy Denney for litigation costs.

$100,000." *Id.* § 3. It is this provision that is the focus of the matter before us.

After the first $10 million installment had been paid into Aaron's special needs trust,[2] the various trial, appellate, and lobbyist firms that had worked on Aaron's case -- with support from the Edwards family -- petitioned the guardianship court to approve a closing account statement transferring $2.5 million to them. The petition premised this request on a 25% fee cap provision in section 768.28(8) and on the argument that the fees and costs limitation in the claims bill was unconstitutional. Evidence presented at the hearing on the petition showed that the firms had devoted more than 7000 hours to representing the Edwards family at trial, on appeal, and during the claims bill process and had also incurred more than $500,000 in costs during the representation. However, the guardianship court, relying on precedent from this court and the Florida Supreme Court, found that it lacked judicial authority to grant the requested relief in contravention of the language of the claims bill regarding fees and costs.

Appellants now appeal that denial and argue that the language in the claims bill limiting their recovery of attorneys' fees and costs is an unconstitutional impairment of their contract with the Edwards family and should be severed from the otherwise valid private relief act for Aaron. Alternatively, Appellants contend the guardianship court had inherent judicial discretion to depart from the limitation imposed by the Legislature and grant them reasonable fees and costs up to the 25% limit provided by section 768.28(8), Florida Statutes (2007).

## II.    A Brief History of Sovereign Immunity

The doctrine of sovereign immunity stretches back to the foundations of Anglo-American common law. Espousing the maxim that "the King can do no wrong," Blackstone explained that "no suit or action can be brought against the King, even in civil matters, because no court can have jurisdiction over him." 1 WILLIAM BLACKSTONE, COMMENTARIES *235.

---

[2] "A special needs trust is a trust agreement, authorized by federal law, which excludes certain assets and income from being counted against eligibility for certain need-based government benefits." Rebecca Berg, et al., *Q & A: Introduction to the State of Florida Public Guardianship Pooled Special Needs Trust*, 81 Fla. B.J. 64 (May 2007). "The key purpose of the special needs trust is to provide for the person with a disability without jeopardizing the receipt of public benefits." Fay Blix, *The World of Special Needs Trusts*, 50 Orange Cnty. Law. 10 (Nov. 2008).

However, should a subject of the Crown have "a just demand upon the King, he must petition him in his court of chancery, where his chancellor will administer right as a matter of grace, though not upon compulsion." *Id.* at \*236.

When the common law was exported to the American continent, sovereign immunity came with it. Although the United States Constitution does not explicitly grant the federal government immunity from suit, sovereign immunity seemingly always has applied. *See U.S. v. Lee*, 106 U.S. 196, 207 (1882) ("[W]hile the exemption of the United States and of the several states from being subjected as defendants to ordinary actions in the courts has . . . been repeatedly asserted here, the principle has never been discussed or the reasons for it given, but it has always been treated as an established doctrine.").

Unlike the apparently axiomatic immunity of the federal government from suits, the states initially were subjected to liability in federal courts. In *Chisolm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793), the United States Supreme Court held that state governments were amenable to suit in federal courts under Article III, Section 2 of the Constitution. Soon thereafter, however, the Eleventh Amendment expanded the doctrine of sovereign immunity to protect state governments from suit by private citizens in federal court. Amend. XI, U.S. Const. State sovereign immunity, protecting the states from suit in their own courts, existed prior to the ratification of and is not derived from the Eleventh Amendment, but

> is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments.

*Alden v. Maine*, 527 U.S. 706, 713 (1999).

After decades of immunity from liability, the federal government abrogated its sovereign immunity by passing the Federal Tort Claims Act in 1946. 28 U.S.C. § 1346(b); *see also The Federal Tort Claims Act*, 56 Yale L.J. 534 (1947). In the years that followed, the states likewise rolled back the protections of state sovereign immunity. In Florida, the state constitution stated, "Provision may be made by general law for bringing suit against the state as to all liabilities now existing or hereafter originating." Art. X, § 13, Fla. Const. (1968). The Florida Legislature passed an experimental temporary waiver of sovereign immunity for a one

year period in 1969 before finally enacting a permanent, limited waiver in 1973. Gerald T. Wetherington & Donald I. Pollock, *Tort Suits Against Governmental Entities in Florida*, 44 Fla. L. Rev. 1, 6 (1992). However, although 1969 saw the first general waiver of the state's sovereign immunity, legislative relief by means of a claims bill has been available since before statehood – the first claims bill was passed by the Legislative Council of the Territory of Florida in 1833. D. Stephen Kahn, *Legislative Claim Bills: A Practical Guide to a Potent(ial) Remedy*, 62 Fla. B.J. 23 (April 1988); *see also Cauley v. City of Jacksonville*, 403 So. 2d 379, 381 n.5 (Fla. 1981).

Section 768.28, Florida Statutes, is the codification of the state's limited waiver of sovereign immunity in tort actions. A plaintiff's recovery against the state and its agencies or subdivisions is limited to no more than $200,000 per incident. § 768.28(5), Fla. Stat. (2007).[3] Moreover, in cases where a judgment exceeds $200,000, "that portion of the judgment that exceeds these amounts may be reported to the Legislature, but may be paid in part or in whole only by further act of the Legislature." *Id.* Subsection 768.28(8) of the same statute states that "[n]o attorney may charge, demand, receive, or collect, for services rendered, fees in excess of 25 percent of any judgment or settlement."

## III. The Treatment of Section 768.28(8) by Florida Courts

Shortly after the enactment of section 768.28, the Florida Supreme Court addressed the constitutionality of the attorneys' fees cap in a case involving the settlement of a damages claim filed against a school board. In *Ingraham v. Dade County School Board*, 450 So. 2d 847, 849 (Fla. 1984), the court held "that section 768.28(8) is constitutional and does not constitute an impairment of contractual obligations and does not amount to a legislative usurpation of the power of the judiciary to regulate the practice of law."

During the same time frame as *Ingraham*, the Florida Supreme Court was faced with another situation involving the legislative claims process. In *Gamble v. Wells*, 450 So. 2d 850 (Fla. 1984), a minor sustained severe injury while in the custody of the State Department of Public Welfare. The child's parent retained a lawyer, who signed a standard contingency fee

---

[3] The initial version of this statute set the waiver amount at $50,000 per person and $100,000 per incident. § 768.28(5), Fla. Stat. (1969). Those limits were increased to $100,000 per person and $200,000 per incident in 1981, section 768.28(5), Florida Statutes (1981), and raised again to the present levels of $200,000 and $300,000 effective April 27, 2012. § 768.28(5), Fla. Stat. (2012).

contract to represent the child. *Id.* at 851-52. As the state had not passed legislation waiving sovereign immunity at the time the injury occurred (and, thus, section 768.28 was not applicable to this case), the attorney petitioned the Legislature for a private relief act.[4] The Legislature passed the requested bill, appropriating $150,000 for the child, but limited the payment of attorneys' fees to $10,000. *Id.* at 852. When the lawyer challenged the constitutionality of this provision as an impairment of his contingency contract, the Florida Supreme Court reversed the Second District Court of Appeal's holding that declared that portion of the bill which limited attorneys' fees to be invalid because of an unconstitutional impairment of contract. The Florida Supreme Court explicitly held that no contract right was impaired. *Id.* Describing the claims bill as "an act of grace," the court held that *the Legislature could* "allow compensation, decide the amount of compensation, and *determine the conditions, if any, to be placed on the appropriation.*" *Id.* at 853 (emphasis added).

A somewhat similar situation was presented to this court in *Noel v. Sheldon J. Schlesinger, P.A.*, 984 So. 2d 1265 (Fla. 4th DCA 2008). A victim, Jean Noel, and her parents sued a governmental entity for damages arising out of medical negligence. *Id.* at 1266. The jury awarded a total of $8.5 million, but the relief was reduced to $200,000 due to the applicability of section 768.28(5). *Id.* The family then petitioned the Legislature. As the culmination of an eight-year legal and legislative process, the Legislature passed a claims bill providing $8.5 million for Ms. Noel and her parents. *Id.* at 1266. The claims bill also provided for payment of attorneys' fees and costs up to $1,074,667, representing approximately 13% of the clients' relief and considerably less than the percentage contracted for or the 25% cap set forth in section 768.28(8). *Id.* When the attorney moved for a charging lien to recover the additional sums provided by the contingency fee contract, this court echoed *Gamble* and held the claims bill to be an act of "legislative grace." *Id.* at 1267. We also reasoned that the attorneys' charging lien was inappropriate in that case because, as enunciated by the Legislature, the property at issue was voluntarily given by the Legislature, "separate and apart" from the recovery in the lawsuit. *Id.* Our court in *Noel* found "a fair reading of the claims bill indicates the legislative intent to limit [attorneys'] fees to $1,074,667"

---

[4] *Gamble* concerns a private relief act, which is the functional equivalent of a claims bill, as presented in our instant case. Section 768.28 codified the waiver of sovereign immunity, but the method for obtaining relief above that section's limits is the same as it was prior to the passage of that law – a claimant must petition the Legislature in hopes that it, in its grace, will provide funds for the benefit of the claimant.

and that "[the] legislature has the power to limit attorney's fees in a claims bill, no matter what the underlying fee contract provides[.]" *Id.*

## IV.    Applicability of the Statute and Precedent to the Instant Case

Judicial determinations concerning the constitutionality of statutes (or portions thereof) are pure questions of law subject to a plenary or *de novo* standard of review. *State v. Sigler*, 967 So. 2d 835, 841 (Fla. 2007). Because the challenged claims bill is a validly passed law, it is "clothed with a presumption of constitutionality," *Crist v. Fla. Ass'n of Criminal Defense Lawyers, Inc.*, 978 So. 2d 134, 139 (Fla. 2008), and all reasonable presumptions must be drawn in favor of its constitutionality. *See State v. Bales*, 343 So. 2d 9, 11 (Fla. 1977).

In the instant case, as in *Gamble* and *Noel*, the Legislature passed a claims bill that provided a specific amount of attorneys' fees that was significantly less than the amount contracted for between the Edwards family and their law firm, Searcy Denney. Indeed, the Legislature in essence reduced Searcy Denney's contingency fee to less than 1% of the $15 million provided by the Legislature.

Notwithstanding Appellants' (and the dissenting opinion's) arguments to the contrary, *Gamble* and *Noel*, and the reasoning therein, support the guardianship court's decision to recognize the Legislature's prerogative of limiting the payment of fees and costs to $100,000. A claims bill, both before and after the enactment of section 768.28, is a "voluntary recognition of its moral obligation by the legislature" and, as such, is firmly entrenched in the sphere of legislative discretion. *Noel*, 984 So. 2d at 1267 (quoting *Gamble*, 450 So. 2d at 853). "Parties cannot enter into a contract to bind the state in the exercise of its sovereign power. . . . The legislature was in no way bound to pass legislation conforming with the provisions of the prior contingent fee contract." *Gamble*, 450 So. 2d at 853. "That the claim[s] bill is separate and apart from the constraints of an earlier lawsuit is demonstrated by the supreme court's recognition that [the] legislature has the power to limit attorney's fees in a claims bill, no matter what the underlying fee contract provides[.]" *Noel*, 984 So. 2d at 1267. "A claim[s] bill is not obtainable by right upon the claimant's proof of entitlement, but rather is granted strictly as a matter of legislative grace." *Wagner v. Orange Cnty.*, 960 So. 2d 785, 788 (Fla. 5th DCA 2007); *see also United Servs. Auto Ass'n v. Phillips*, 740 So.2d 1205, 1209 (Fla. 2d DCA 1999).

We are sympathetic to the fact that the legislatively enacted attorneys' fees cap in this case failed to cover even the $500,000 in Appellants' costs advanced by Searcy Denney during their representation of the Edwards

family.  But our responsibility in this matter is to ensure that the claims bill passed by the legislative branch of government meets constitutional muster.  As noted above, the Florida Supreme Court, in no uncertain terms, has held that the limitation of attorneys' fees in a private relief act/claims bill "is a constitutionally permissible exercise of legislative authority and does not constitute an impairment of contractual obligations proscribed by article I, section 10 of the Florida Constitution."  *Gamble*, 450 So. 2d at 851; *see also Ingraham*, 450 So. 2d at 849.·

Appellants contend the Legislature's claims bill's fees and costs limitation impermissibly runs contrary to preexisting statutory limitations.  They posit that the Supreme Court's decision in *Ingraham*, decided the same day as *Gamble*, supports the argument that "the 25% limitation on attorney's fees and costs provided by § 768.28(8) applied" to claims bills, as well as settlements and judgments reached outside of the claims bill process.  *Ingraham* addressed an effort by the plaintiff's attorney to receive fees *in excess* of 25% of a structured settlement and the Supreme Court's application of section 768.28(8) to negate that effort.  In the instant case, by contrast, the law firms are seeking fees and costs representing 25% of a special legislative appropriation.

Regardless of whether Aaron's claims bill appropriation is categorized as a "judgment or settlement," section 768.28(8) does not mandate that the fees collected or received cannot be less than 25%, only that the fees cannot be "in excess of 25 percent."  The statute places a cap on the recoverable attorneys' fees, not a floor.  Twenty five percent is not, by its very terms in this statute, a *mandatory minimum*.

Appellants also argue that the courts' respecting the Legislature's $100,000 limitation is a usurpation of judicial power and that this limitation violated the separation of powers doctrine.  To the contrary, the course of action proposed by Appellants would violate the separation of powers doctrine, rewriting two legislative enactments, both section 768.28(8) and Aaron's claims bill, to *dictate* attorneys' fees that are neither mandated by the former (because it sets a ceiling, and not a floor) and are expressly contrary to the latter (which limits fees and costs to $100,000).  Appellants' alternative arguments, including that the legislative action amounted to an unconstitutional taking, violated the due process clause, or denied them equal protection, are likewise unpersuasive, particularly where the Florida Supreme Court already has explicitly sanctioned the action at issue.  *Gamble*, 450 So. 2d at 851.

**Conclusion**

8

Appellants' (and the dissenting opinion's) dissatisfaction with the limitation on attorneys' fees and costs imposed in Aaron's claims bill is understandable, and the possibility of such a restriction in a claims bill posits an additional factor to be considered by counsel in deciding whether to take on representation in a case in this state involving a sovereign entity defendant. Appellants' reply brief states, "If there is no reasonable financial incentive for lawyers to take these type cases, the injured will go unrepresented." To what extent this is true is beyond our focus.[5] Therefore, we affirm the guardianship court's ruling.

*Affirmed.*

CONNER, J., specially concurs with opinion.
CIKLIN, C.J., dissents with opinion.

CONNER, J., concurring.

Anytime legal analysis traces back to Blackstone and the foundations of Anglo-American law, one knows core legal values are being addressed. I write to further explain why I cannot agree with the reasoning of the dissent, although the dissent makes very cogent arguments as to why *Gamble* and *Noel* should not control the outcome of this case.

The premise of the dissent is that by enacting section 768.28, Florida Statutes, the legislature altered the "legislative grace" attribute of its monetary awards by making a judicial or administrative award a precondition for initiating the claims bill process. The argument is that you can't even try to pass through the doors of the legislature until you successfully pass through the doors of the courthouse. Thus, the two processes are welded; this means the "act of grace" analysis has been "transcended" because the weld now raises the specter of "a chilling effect upon the sacrosanct and fundamental constitutional right to access to our courts."

The fly in the ointment regarding the dissent's argument is the failure to recognize that seeking redress from the legislature is fundamentally different from seeking redress from the court. Every citizen has a fundamental right to seek redress from the court because that is a core function of the judicial branch of government. There is no fundamental right to seek redress from the legislature because such is not a core

---

[5] Our sister courts have commented in cases involving section 768.28(8), Appellants' "remedy is in the legislature, not the courts." *City of Live Oak v. Harris*, 702 So. 2d 276, 277 (Fla. 1st DCA 1997) (quoting *Hellman v. City of Orlando*, 634 So. 2d 245, 246 (Fla. 5th DCA 1994)).

9

function of that branch. Within the judicial branch, an injured party has a legal right to an award of damages if procedural and substantive law principles are successfully maneuvered. There is no similar right within the legislative branch.[6] The concept of "legislative grace" espoused by our supreme court in *Gamble* implicitly recognized the difference in core functions between the two branches of government. That recognition resulted in the rather forceful statement by the court in *Gamble*, that "[p]arties cannot enter into a contract to bind the state in the exercise of its sovereign power." *Gamble*, 450 So. 2d at 853. Out of respect for the separation of powers between the two branches, even considering the statutory and legislative rule changes since *Gamble*, it is unlikely the court would rule that the legislature's ability to limit attorney's fees payable out of a claims bill award is unconstitutional because such power impacts access to the courts.

Therefore, I agree with the majority opinion that unless our supreme court changes course in its legal analysis regarding separation of powers, arguments regarding impairment of contract, unconstitutional taking, denial of due process and equal protection and all variations on those themes are unpersuasive.

*Affirmed.*

CIKLIN, C. J., dissenting.

I respectfully dissent and offer my overall assessment of the crucially important issues involved in this case, the ultimate resolution of which will have deep and profound ramifications for many Floridians—and for many years to come.

The instant appeal involves a claim bill passed by the Florida Legislature granting Aaron Edwards and, in essence, his parents a substantial sum of money as compensation for damages occurring because of the negligence of Lee Memorial Health System ("the hospital"), an entity with sovereign immunity, but yet effectively prohibiting the Edwards' attorneys from collecting anything but nominal fees and costs connected with their services throughout the twelve years leading up to the enactment of the subject claim bill. In 1999, Aaron's parents and Searcy Denney, et al. ("the firm"), entered into a binding contract which

---

[6] It is also significant that the successful outcome of redress through the courts is a judgment for damages, with no guarantee that money will ever be paid to the claimant. The successful outcome of redress through the legislature is a sum of money received by the claimant.

provided that the firm was to receive a defined percentage of any recovery it obtained on Aaron's behalf. The agreement included a reduced fee provision in accordance with the limit on attorneys' fees imposed by the statute governing waiver of sovereign immunity in tort actions, section 768.28, Florida Statutes (1997). Pursuant to the contract, if the firm obtained zero for Aaron, the firm would be compensated zero, without regard to firm time expended or monies advanced. The Edwards and the firm appeal the guardianship court's denial of the firm's petition seeking approval of a closing statement which was in conformity with section 768.28 and a declaratory judgment relating to attorneys' fees and costs owed to the firm.

Because the claim bill's limitation on attorneys' fees and costs is an unconstitutional impairment on the Edwards family and firm's right to contract, I would reverse. I have taken the liberty to also write to remind the readers of this dissent and all Florida lawyers, that contingency fee agreements are directly connected to every citizen's right to access to our courts. I cite to the Florida Code of Professional Responsibility which contemplates the ethical and moral obligation of "us lawyers" licensed to practice in this state, to always consider the contingency fee agreement as the "poor man's key to the courthouse." Because of the enactment of section 768.28, which now requires that aggrieved individuals first invoke the civil process of law before even approaching the Legislature for sovereign immunity relief, the "key" should be easily accessible. The right to this key is rich and deeply rooted in American history and it is a judicial time-honored duty and responsibility to protect the inalienable rights of our people in this regard.

## **Legal Background**

Pursuant to Article X, section 13 of the Florida Constitution, section 768.28, Florida Statutes was enacted as the first codification of the state's limited waiver of sovereign immunity in tort actions. Stated another way, section 768.28 is the state's consent to be sued. Pertinent to the issues at hand, section 768.28 provided, and continues to provide: a limited waiver of sovereign immunity for actions against the state and its agencies, the possibility of additional compensation for injuries through legislative claim bills, and a twenty-five percent maximum limit on fees for lawyers who offer legal assistance.

In 1997, the year the subject cause of action accrued, the statute permitted recovery of up to $100,000 per person and $200,000 per incident or occurrence:

> Neither the state nor its agencies or subdivisions shall be liable to pay a claim or a judgment by any one person which exceeds the sum of $100,000 or any claim or judgment, or portions thereof, which, when totaled with all other claims or judgments paid by the state or its agencies or subdivisions arising out of the same incident or occurrence, exceeds the sum of $200,000.

§ 768.28(5), Fla. Stat. (1997).[7]

Most notable from a statutory analysis standpoint, however, was this legislative enactment's first-time-ever-authorization and consent to be sued by a private party. The statute was specific and empowering for legitimately injured individuals:

> [A] judgment or judgments may be claimed and rendered in excess of these amounts and may be settled and paid pursuant to this act up to $100,000 or $200,000, as the case may be; and that portion of the judgment that exceeds these amounts may be reported to the Legislature, but may be paid in part or in whole only by further act of the Legislature.

*Id.* In giving its consent to be sued, the Legislature—also for the first time—required that all aggrieved parties seeking just compensation beyond the maximum amounts permitted by section 768.28, first obtain an award of a civil judgment under the processes supervised by the courts. The Legislature also contemplated the very real possibility that the newly required "judgment or judgments" might exceed the statutory caps and therefore authorized the aggrieved party to "report" and make a "claim" to the Legislature as to the excess amount.

As a matter of fact, through its internal rule making process, the Florida Senate went so far as to expand upon section 768.28, and while consenting to be sued, created an unequivocal threshold. Pursuant to the Rules of Senate, a claim bill may not be heard or considered by the Senate "until all available administrative and judicial remedies have been exhausted." Senate Rule 4.81(6). In other words, while the Senate Rule has acknowledged the new rights afforded by section 768.28 by permitting a person to report a claim and seek just compensation, the Senate went one step further and decided to shut out all aggrieved persons from the

---

[7] The statute was subsequently amended to allow liability of up to $200,000 per person and $300,000 per occurrence. § 768.28(5), Fla. Stat. (2012).

Senate claim bill process until the person suffering damages first obtains a judgment or other administrative final order. With that final document in hand, the aggrieved individual is *then* permitted to navigate through the claim bill process.

Finally, and perhaps most significant of anything, subsection 768.28(8) implicitly (and presumably) recognized, for the first time, that an aggrieved party might very well be foolhardy to enter into the complex legal world of the now required civil negligence litigation (and subsequent claim bill) process without full access to the courts through a lawyer/client contingency fee agreement:

> No attorney may charge, demand, receive, or collect, for services rendered, fees in excess of 25 percent of any judgment or settlement.

§ 768.28(8), Fla. Stat. (1997). The subsection, incidentally, which puts a cap or "ceiling" on contingency fee contract compensation, has been held by the Florida Supreme Court to be a constitutionally permissible limit on attorneys' fees. *Ingraham v. Dade Cnty Sch. Bd.*, 450 So. 2d 847, 849 (Fla. 1984).

### Factual Background

The firm represented the parents of Aaron Edwards, a child born with catastrophic brain injuries in 1997 due to the overt negligence of the hospital and its employees, in a medical malpractice claim against the hospital. The firm entered into a standard contingency fee agreement with the Edwards family, providing for an attorney's fee of forty percent of any recovery if a lawsuit was filed, plus costs. The contract appropriately reduced the fee to the amount provided by law—the twenty-five percent cap contained in section 768.28(8)—in the event the hospital was declared a sovereign immune defendant.

After a trial lasting approximately five grueling weeks, the jury awarded Aaron $28,310,544 in damages. Aaron's mother was awarded $1,340,000 and his father was awarded $1,000,000. The trial court found that the hospital was an "independent special district" of the state, and therefore had sovereign immunity. Consistent with the damages limitation provided for in section 768.28(5), the court entered a judgment against the hospital in the amount of $200,000. On appeal, the judgment was affirmed and the hospital did not challenge the amount of damages awarded by the jury.

At the behest of the firm and Aaron's parents, a member of the Florida Senate and a member of the Florida House of Representatives requested that the Florida Legislature enact a claim bill to further compensate Aaron and his family. After a highly protracted legislative process spanning a two-year period, the Legislature passed Claim Bill 2012-249. The bill directed the hospital to pay $15,000,000 "to the Guardianship of Aaron Edwards, to be placed in a special needs trust created for the exclusive use and benefit of Aaron Edwards, a minor." Ch. 2012-249, Laws of Fla. The claim bill provided for an initial payment of $10,000,000 on or before December 31, 2012, and for subsequent periodic payments of $1,000,000 each year through 2017. It also included the following provision, which is the focal point of the issues raised in this appeal: "The total amount paid for attorney's fees, lobbying fees, costs, and other similar expenses relating to this claim may not exceed $100,000."

After a guardianship proceeding was instituted by Aaron's parents, the firm filed a petition requesting that the guardianship judge approve a proposed closing statement that would have authorized an award of $2,500,000 to the firm, which represented twenty-five percent in attorneys' fees (and which would have included all costs and lobbying fees). These payments, it was proposed by the Edwards family and the firm, would be deducted from the initial claim bill payment of $10,000,000 to Aaron. The petition before the guardianship court also sought a declaratory judgment upholding the constitutionality of Aaron's claim bill, but striking the $100,000 attorneys' fees and costs limitation as unconstitutional on its face or as applied. The guardianship judge denied the petition, accepting the attorney general's argument that the claim bill was an "act of grace," thus entitling the Legislature to limit attorneys' fees and costs payable to the firm. In a conspicuously reluctant order, the guardianship court recognized that the firm had provided "exemplary" legal services and that fees of $100,000 were unreasonable where the firm had advanced $500,000 in costs alone, but the court determined it was bound by two cases, *Gamble v. Wells*, 450 So. 2d 850 (Fla. 1984), and *Noel v. Sheldon J. Schlesinger, P.A.*, 984 So. 2d 1265 (Fla. 4th DCA 2008).

On appeal, the appellants argue the fee-limiting provision of the subject claim bill is in contravention of the Contract Clause of the United States Constitution and that the cases the guardianship court relied upon, *Gamble* and *Noel*, are not controlling. They seek severance of the fee-limiting provision from the claim bill. The state responds by asserting that the provision passes constitutional muster because claim bills are "acts of legislative grace" and further that the fee provision is not severable.

**Discussion and Judicial Review**

I believe the primary issue for our review centers around the constitutionality, vel non, of the subject claim bill provision limiting attorneys' fees and costs to $100,000, juxtaposed against the twenty-five percent fee agreed upon in the contingency fee contract entered into between the Edwards family and the firm.

This court's constitutional responsibility to review the subject claim bill at issue stems from and is deeply embedded in the doctrine of separation of powers, under which the legislative branch of government creates laws and the judicial branch reviews laws, including for purposes of determining that the laws are constitutionally permissible. The role of the judiciary in this process is known as judicial review, which is defined as "[a] court's power to review the actions of other branches or levels of government; esp., the courts' power to invalidate legislative and executive actions as being unconstitutional." BLACK'S LAW DICTIONARY 864 (8th ed. 2004).

> The original idea of judicial review seems to have been conceived primarily to preserve the integrity and uphold the independence of the courts as against the other departments, and to preserve and protect certain personal and private rights, such as the right of trial by jury, which were thought to be natural and inalienable.

Charles Grove Haines, *Judicial Review of Legislation in the United States and the Doctrines of Vested Rights and of Implied Limitations on Legislatures*, 2 TEX. L. REV. 257, 270 (1924) (footnote omitted). Describing judicial review, commentators have explained that "because of its status as a coordinate branch of government, the judiciary must refuse to enforce unconstitutional laws in the course of performing its unique function of deciding cases or controversies." Saikrishna B. Prakash & John C. Yoo, *Questions for the Critics of Judicial Review*, 72 GEO. WASH. L. REV. 354, 356 (2003).

Turning to the matter at hand, "judicial interpretation of statutes and determinations concerning the constitutionality of statutes are pure questions of law subject to the de novo standard of review." *State v. Sigler*, 967 So. 2d 835, 841 (Fla. 2007).

*Contract Clause*

Pursuant to Article I, Section 10 of the federal Constitution, states may not pass "any law that impairs 'the Obligation of Contracts.'" *Columbia*

15

*Hosp. Corp. of S. Broward v. Fain*, 16 So. 3d 236, 243 (Fla. 4th DCA 2009). Similarly, Article I, section 10 of the Florida Constitution provides that "No . . . law impairing the obligation of contracts shall be passed."

The Florida Supreme Court "has generally prohibited all forms of contract impairment." *State, Dep't of Transp. v. Edward M. Chadbourne, Inc.*, 382 So. 2d 293, 297 (Fla. 1980). It has described the constitutional bar on such impairments as a "wall of absolute prohibition." *Id.* The court has explained, "The fact that a law is just and equitable does not authorize its enactment in the face of a constitutional prohibition." *Id.*

The right to contract for legal services is a fundamental constitutional right implicating strict scrutiny. *Jacobson v. Se. Pers. Leasing, Inc.*, 113 So. 3d 1042, 1050 (Fla. 1st DCA 2013). "[W]hen a right to recover . . . attorney's fees (as damages or as costs) is provided by contract, such contractual right cannot be constitutionally impaired by subsequent legislation which attempts to restrict, expand, or eliminate that contractual right." *Xanadu of Cocoa Beach, Inc. v. Lenz*, 504 So. 2d 518, 519 (Fla. 5th DCA 1987).

"In order for a statute to offend the constitutional prohibition against enactment of laws impairing the obligation of contracts, the statute must have the effect of rewriting antecedent contracts, that is, of changing the substantive rights of the parties to existing contracts." *Manning v. Travelers Ins. Co.*, 250 So. 2d 872, 874 (Fla. 1971) (citations omitted). Where subsequent legislation impairs an existing contractual right, "[c]ourts employ a balancing test which measures the level of impairment against the public service to be served." *Fain*, 16 So. 3d at 243. And, to be sure, "'[a]n impairment may be constitutional if it is reasonable and necessary to serve an important public purpose.'" *Id.* (quoting *Pomponio v. Claridge of Pompano Condo., Inc.*, 378 So. 2d 774 (Fla. 1979)).

This required balancing test has been described by the United States Supreme Court as follows:

> [T]he first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244-45 (1978) (footnotes omitted).

> [A] finding of a significant and legitimate public purpose is not, by itself, enough to justify the impairment of contractual obligations. A court must also satisfy itself that the Legislature's adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the Legislature's] adoption.

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987) (alterations in original) (internal quotation marks omitted).

Because Aaron's claim bill substantially, if not entirely, impaired the Edwards' ability to perform their contractual obligation to pay attorneys' fees amounting to twenty-five percent of their recovery, the balancing test must clearly and obviously be applied. At the time Aaron's parents and the firm entered into their contract, the law provided for a maximum contingency fee of twenty-five percent pursuant to subsection 768.28(8). In accordance with the $15,000,000 appropriation to Aaron under the claim bill, the bargained-for attorneys' fees totaled $3,750,000 plus costs which the record reveals to be approximately $500,000. The record further reveals that, over a twelve-year period, the firm laboriously committed thousands of pretrial, trial, and post-trial hours, culminating in compensation for a severely brain damaged child caused by the outright negligence of a medical provider. Yet, the claim bill proviso restricted and limited attorneys' fees and costs to $100,000—*less than one percent of the recovery achieved for Aaron.* Certainly, an alarming, inexplicable, and far cry from the 25% contractual fee and cost provision agreed to by the firm and Aaron's parents. The attorneys' fee provision of the subject claim bill delivers a substantial impairment of the contract between the firm and the Edwards family, requiring this court to examine the nature and purpose of the statute.

I believe the state has not shown that its draconian limitation on attorneys' fees and costs was necessary to accomplish some type of "important public purpose." It cannot be reasoned that the provision was inserted to accomplish preservation of the State's treasury, since the claim bill provided that the attorney's fees and costs would be deducted from the total appropriation which total sum *would ultimately be paid by the hospital* with its own funds.

Therefore, without a logical, practical, or otherwise discernable public purpose, the fee limitation imposed in Aaron's claim bill does not pass muster under strict scrutiny. Simply put, the Aaron Edwards claim bill contravenes the constitutional prohibition on the impairment of existing contracts.

### *Gamble, Noel, and Legislative Grace*

The state argues that the Legislature was within its rights to limit the attorneys' fees to the extent it did because the claim bill was an act of "legislative grace." It relies on two cases for support, *Gamble* and *Noel*, the same two cases by which the trial court felt bound to deny both the petition and declaratory judgment. For several reasons, *Gamble* is decidedly distinguishable.

In *Gamble*, the plaintiff was in the custody of the State Department of Public Welfare[8] for a number of years and was injured due to the department's negligence. The plaintiff's guardian entered into a contingency fee agreement with an attorney. Because the defendant was a sovereign entity and section 768.28 was not yet in effect,[9] the plaintiff's only avenue for recovery from the welfare department was a direct appeal to the Legislature through a claim bill. Because the arduous undertaking of malpractice litigation was not contemplated, or for that matter even permitted by the statute in effect when *Gamble* was decided, no lawsuit was ever filed. Nonetheless, as a result of a legislative act of grace, no doubt undergirded by a commendable sense of moral obligation, the Legislature enacted a claim bill to compensate the plaintiff, and limited any attorneys' fees to $10,000. The attorney sought fees in the probate court pursuant to the terms of the contingency fee agreement and was awarded $50,000. On appeal, the district court reversed, finding that the

---

[8] The State Department of Public Welfare was administered, along with twelve district boards, by the State Welfare Board, which was created in 1937. These agencies administered state and federal funding for social welfare services and relief aid. The State Department of Public Welfare became the Division of Family Services in 1969. Presently, family services are administered by the Department of Children and Families. Fla. Dept. of State, State Archives of Fla., http://archivescatalog.info.florida.gov/default.asp?IDCFile=/fsa/detailsg.idc,SPECIFIC=1635,DATABASE=GROUP, last visited Apr. 1, 2015.

[9] As a reminder, 768.28 now contemplates the plaintiff's procurement of a "judgment" and Senate Rule 4.81(6) requires it . . . or at least that "all available administrative and judicial remedies" shall have been "exhausted" before a plaintiff will even be permitted to enter into the uphill battle that is the claim bill process.

18

attorneys' fees limitation in the claim bill "amounted to an unconstitutional impairment of a contractual obligation but that this limitation was severable from the remainder of the private relief act." *Gamble*, 450 So. 2d at 852.

The Florida Supreme Court reversed, explaining that passage of the claim bill was an "act of grace" by the Legislature and that as a "matter of grace," the Legislature could place limitations on any compensation it allowed therein:

> We disagree and hold that no contract rights were impaired by section 3 of chapter 80-448 [the private relief act]. By enacting chapter 80-448, the legislature found that a moral obligation existed on its part to redress the physical and emotional injuries of Cynthia Gamble sustained as a result of the negligence of a state agency. This voluntary recognition of its moral obligation by the legislature in this instance was based on its view of justice and fair treatment of one who had suffered at the hands of the state but who was legally remediless to seek damages. Chapter 80-448 is an act of grace to redress a wrong suffered by Cynthia at the hands of the state which is not otherwise legally compensable. In seeking to obtain relief for Cynthia by means of a private relief act, [claimant's attorney] was not in a position to demand that the legislature grant compensation to Cynthia. He could only request that the legislature grant the compensation sought. The legislature then, as a matter of grace, could allow compensation, decide the amount of compensation, and determine the conditions, if any, to be placed on the appropriation.

> Parties cannot enter into a contract to bind the state in the exercise of its sovereign power. The legislature had the power to place the attorney's fee limitation in chapter 80-448. [Gamble's attorney], by the terms of his contingent fee contract with Gamble, could not deprive the legislature of this power. The legislature was in no way bound to pass legislation conforming with the provisions of the prior contingent fee contract.

*Id.* at 852-53.

However, changes in the law and legislative procedure have rendered *Gamble* distinguishable and inapplicable to the facts at hand. After the

19

cause of action accrued in *Gamble* and before Aaron's family formally entered into the subject contingency fee agreement, the Legislature enacted section 768.28, which, for the first time, (1) afforded a limited monetary waiver of immunity for tort actions; (2) required finality in an official judicial or administrative proceeding as a condition precedent to invoking the claim bill process; (3) recognized the possibility of a contingency fee agreement in procuring the official judicial or administrative final order by imposing a twenty-five percent cap as to any attorneys' fees payable under a contingency fee agreement; and (4) provided for ultimate presentation to the Legislature for its consideration when the newly required official administrative or judicial action exceeded the limits of liability.

With the enactment of section 768.28, the Legislature's exercise of its prerogative to choreograph rights pertaining to sovereign immunity went from a blank page with no codified rights, save for some undefined historical doctrine, to a multi-step process for those who suffered damages because of the negligence of a sovereign entity. It was in reliance on this legislative action that the Edwards family and the firm came to a rock solid agreement.

Unlike the instant case, where the Edwards family was permitted and required to file a lawsuit and obtain a bona fide judgment pursuant to section 768.28(5), the plaintiff in *Gamble* was not entitled—and thus had no need—to seek relief and exhaust any remedies before going directly to the Legislature. Because no statutory mechanism for sovereign immunity relief existed for Cynthia Gamble, she could *only* recover through an amorphous act of legislative grace as part of a private relief act. It was against this backdrop that the supreme court held the claim bill in *Gamble* was solely an act of legislative "grace to redress a wrong . . . at the hands of the state which is not otherwise legally compensable." *Gamble*, 450 So. 2d at 853. And that once an injured party requested relief, the Legislature could, "as a matter of grace," bestow compensation for damages suffered by the victim and determine any conditions to place on the appropriation made under the private claim bill. *Id.*

Interestingly and notably, since *Gamble*, the Florida Senate has gone so far as to adopt its Rule 4.81(6), which provides in pertinent part, "The hearing and consideration of a claim bill shall be held in abeyance until all available administrative and judicial remedies have been exhausted . . . ." As recognized by the trial court below, "[i]t is undisputed that under the rules of the Florida Legislature, in force throughout the representation of Aaron Edwards by [the firm], Aaron Edwards and his family were

required to exhaust all legal remedies before pursuing legislative relief to recover damages in excess of the sovereign immunity limits of $200,000."

Aaron's road to a fair recovery was completely different from Cynthia Gamble's. Before making *his* pitch to the Legislature, Aaron was *required* to first invoke all judicial and administrative processes perhaps because, presumptively, policy makers recognized the efficient, fair, orderly and in some cases, quite civic process involved in presenting a case to an independent fact finding person or cross-section of the community. In the case of a jury trial, the Legislature has called upon the citizens of our communities to judge the claims of our peers through the civil jury system—free of politics and in accordance with America's sacrosanct jury system. Or if a non-jury or other administrative matter is to be conducted, one can only assume that the Legislature designed that process to likewise give a fair and just hearing, leading to a final disposition based ideally on the strict merits (or lack thereof) of any given claim.

Because of the sea change that occurred as a result of the Legislature's enactment of 768.25, *Gamble's* "act of grace" reasoning is significantly and necessarily altered. A would-be claimant is *now required* to undertake formal judicial (or administrative) action before bringing his or her plea to the Legislature.

Here, subsection 768.28(5) and Senate Rule 4.81(6) compelled the Edwards family to seek a judgment before seeking a claim bill. That is, colloquially speaking, the Edwards family was required to "lawyer up." The Edwards family complied with these requirements, and wisely obtained counsel to assist them in doing so. *See, e.g., Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1387 (7th Cir. 1992) ("[L]aypersons have a right to obtain meaningful access to the courts, and to enter into associations with lawyers to effectuate that end."). Clearly, Aaron was able to procure the necessary representation because of the exact wording of the Legislature's enactment of subsection 768.28(8). The Legislature advised the firm and all lawyers similarly situated that contingency fee agreements between the aggrieved party and legal counsel would be recognized and permitted albeit with a 25% maximum legal fee.

The state urges us to consider the fact that this court echoed *Gamble*'s reasoning in *Noel*, 984 So. 2d at 1267, well after the enactment of section 768.28. There, the plaintiff and her parents obtained a $6.5 million jury award against the State Department of Health and Rehabilitative Services arising out of a botched medical treatment. The Noels received $200,000, consistent with section 768.28(5)'s damages cap. Subsequently, the Legislature passed a claim bill appropriating $6.5 million for the plaintiff

and $2 million for her parents.  The bill limited attorneys' fees and costs to $1,074,677.  *Against the parents' wishes,* their attorney sought to obtain a charging lien against the appropriation for the balance of attorneys' fees owed under the contingency fee agreement.  This court held the charging lien could not be imposed against the claim bill:

> A charging lien "is an equitable right to have costs and fees due an attorney for services in the suit secured to him in the judgment or recovery in that particular suit." *Rudd v. Rudd,* 960 So. 2d 885, 887 (Fla. 4th DCA 2007) (internal citations omitted).  "[T]he lien will attach only to the tangible fruits of the services." *Id.* (citation omitted).  "By definition, an attorney's charging lien cannot attach to property not involved in the suit and not before the court." *Id.* (quoting *Cole v. Kehoe,* 710 So. 2d 705, 706 (Fla. 4th DCA 1998)).

*Noel,* 984 So. 2d at 1266-67.  Our determination that the trial court erred was largely, if not entirely, based on the fact that the trial court permitted the attorneys for Noel to re-open the case to impose an attorneys' fee charging lien when the funds from the claim bill were never a part of the stand-alone charging lien action before the trial court.  And unlike the instant case where the Edwards family protested the impairment of their contract with the law firm, the Noel family did not object to the Legislature's limitation on fees.  *Noel*'s reasoning remains sound because the facts relating to the issue in that case—the improper charging lien— were dispositive.[10]

In the final analysis, approval of a claim bill that impermissibly includes an impairment of a constitutional right to secure counsel through a legally binding contract now, for many reasons, transcends previous "act of grace" analyses.

In sum, I would find that the attorneys' fee provision as to Aaron's claim bill was unconstitutional as it acted as a substantial impairment on the vested contract rights that the Edwards family enjoyed with the firm.  And equally as determinative, there was no significant, legitimate or otherwise discernable public purpose for imposing the impairment.  Instead, the unconstitutional impairment of the fees and arbitrary cap on costs

---

[10] While the single issue in *Noel* was the Noel lawyer's attempt to attach an attorney lien against the claim bill proceeds, the *Noel* opinion, in pure dicta, goes on to discuss the legislatively-imposed limit being permissible due to the nature of the claim bill as an "act of grace." *Id.* at 1267.

advanced on Aaron's behalf renders it a near certainty that the Edwards family would not have been able to secure representation of their abundantly meritorious—*and their now legislatively required*—claim had they and the firm known at the time that their duly executed contingency fee contract could be subsequently nullified by a legislative claim bill. The impairment and actual evisceration of the subject contract is not permitted under the United States Constitution or the Florida Constitution.

## The Power of a Contingency Fee Agreement

Though often unfairly reduced to nothing more than a product of barristerial greed, contingency fee contracts can and do serve a pivotal function in our justice system. When put to their strongest and most ethical purposes, contingency fee agreements are an essential part of Florida's legal assistance delivery system. In many circles, they are considered sacrosanct vehicles through which injured persons of limited means are given a key to the courthouse. In enacting section 768.28, the Legislature, when considering waivers of sovereign immunity, demurred to the judicial system's legal process as a necessary first step before seeking a sovereign immunity waiver from the Legislature. Automatically therefore, that triggers the constitutional mandate that all citizens—rich or poor—have the same "all access pass" to our system of justice.

Access to courts is a fundamental bedrock principle of our legal system recognized by the Florida Constitution: "The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay." Art. I, § 21, Fla. Const. *This is as originally constructed as it gets, with its roots in Florida's constitution of 1838. See* Art. I, § 9 Fla. Const. of 1838 ("[A]ll courts shall be open, and every person, for an injury done him, . . . shall have remedy by due course of law; and right and justice administered without sale, denial, or delay.").

The right of access to courts is deeply rooted in American history. As was notably recognized in chapter 40 of the Magna Carta:

> To no one will we sell, to no one will we refuse or delay, right or justice.

*See Henderson v. Crosby*, 883 So. 2d 847, 851-52 (Fla. 1st DCA 2004) (discussing the origin of the access-to-courts provision of the Florida Constitution). And in Justice Bradley's dissent in the *Slaughter-House Cases*:

But even if the Constitution were silent, the fundamental privileges and immunities of citizens, as such, would be no less real and no less inviolable than they now are. It was not necessary to say in words that the citizens of the United States should have and exercise all the privileges of citizens; the privilege of buying, selling, and enjoying property; the privilege of engaging in any lawful employment for a livelihood; the privilege of resorting to the laws for redress of injuries, and the like. Their very citizenship conferred these privileges, if they did not possess them before.

83 U.S. (16 Wall.) 36, 119 (1872) (Bradley, J., dissenting).

And in 1907, when the United States Supreme Court recognized the right to seek redress as one of the most essential privileges of citizenship in our country:

The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship. . . .

*Chambers v. Balt. & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907) (citations omitted).

Indeed, Chief Justice Marshall, in delivering a unanimous opinion for the Court, addressed the fundamental right to claim the protection of laws:

The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. . . .

. . . .

"[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded."

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES *23).

Courts have long recognized the ability to employ legal counsel as an important part of the right of access to courts. *Lawline*, 956 F.2d at 1387 (interpreting *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 221–22 (1967) (holding "the freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments gives petitioner the right to hire attorneys on a salary basis to assist its members in the assertion of their legal rights.")). Additionally, the right of access to courts has been interpreted to include a prohibition on the imposition of unreasonable financial burdens that serve to obstruct individual access to our courts. *See generally Achord v. Osceola Farms Co.*, 52 So. 3d 699, 702-04 (Fla. 4th DCA 2010).

Unfortunately, competent legal representation, effectively now legislatively mandated for individuals like Aaron, necessarily comes at a high cost. Clearly, there are people, such as the Edwards family, who simply cannot afford to hire a counselor-at-law on an hourly rate, nor pay the out-of-pocket costs of malpractice litigation.[11] Thus, for those economically disadvantaged individuals who have been quantifiably injured at the hands of a clearly negligent party, an attorney who agrees to enter into a contingency fee agreement may be a victim's only option.[12]

---

[11] A recent essay published by Duke Law Magazine, cited alarming access to court statistics:

> It's a sobering statistic: About 80 percent of the serious civil legal needs of low-income Americans go unmet. Millions of people with claims to assert, claims to defend, or both, simply never connect with lawyers or obtain the legal help they need. Perhaps it is because they don't know their rights, because they don't know how, or because they can't afford to pay an attorney and can't find one to work for free. Whatever the reasons, the results can be dire for people in or on the edge of poverty . . . .

Frances Presma, *Can We Close the Justice Gap?*, 34 DUKE L. MAG. 20, 21 (2015).
[12] Chief Justice Jorge Labarga recently launched the Florida Commission on Access to Civil Justice to study "unmet civil legal needs of disadvantaged, low income, and moderate income Floridians." *In re* Florida Commission on Access to Civil Justice, Fla. Admin. Order No. 14-65 (Nov. 24, 2014) (on file with Clerk, Fla. Sup. Ct.). One of the tasks ascribed to the Commission is to, "[i]dentify and build partnerships among the courts, members of the private bar, providers of legal services, and other stakeholders who are engaged or interested in expanding access to civil justice for disadvantaged, low income, and moderate income Floridians." *Id.* Presumably, this group of practitioners includes those attorneys willing to take on low income clients pursuant to a contingency fee agreement even though sometimes at a considerable, certifiable, and potentially huge financial risk.

To that end, one would expect that contingency fee contracts are directly related to the constitutional right of access to courts together with ethical and moral obligations of lawyers. And in fact, they are. The Florida Code of Professional Responsibility "expressly sanctions the contingent fee arrangement" based on the rationale that it is the "poor man's key to the courthouse." *Fla. Bar in re Amendment to Code of Prof'l Resp.*, 349 So. 2d 630, 633 (Fla. 1977) (citing Ethical Consideration 2-20, Code Prof. Resp.).

"It is irrefutable that the poor and least fortunate in our society enjoy access to our courts, in part, because of the existence of the contingent fee." *Id.* The costs associated with representing legitimately injured plaintiffs in medical malpractice cases such as Aaron's catastrophic brain injury are exceptionally steep. This is obviously due largely to the unique expertise required to prove causation and injuries in complex fact and law situations.

Empowered by the contingency fee contract, individuals such as Aaron and his family who are without economic means to pay attorneys' fees and advance the costs of litigation are *able to bring their legislatively-mandated claims* without the concern of reimbursement for these fees and costs in the event they do not prevail. Already facing substantial medical bills, had the Edwards family been unable to find an attorney willing to enter into a contingency fee arrangement, the hundreds of thousands of dollars required to pursue this legislatively-required cause of action and thereby access justice, would have been improbable at best.

Accordingly, I would also reverse the guardianship court on the basis that the subject claim bill's attorney's fee limitation—and the majority's affirmation of this legislative proviso—has now invaded and will continue to wreak a chilling effect upon the sacrosanct and fundamental constitutional right to access to our courts—particularly for those suffering damages at the hands of government. To require individuals to first access our courts before availing themselves of the claim bill process *but then likewise creating an impediment* toward that access is the antithesis of our very essence of civil liberty. Certainly the Legislature did not intend to amputate a person's fundamental right of redress.

### Severability of the Attorneys' Fee Provision of the Claim Bill

Finally, this court must determine whether the constitutionally invalid attorneys' fee provision—as I believe it to be—may be severed from the claim bill or whether it is essential to the bill's operation. *See Fla. Dep't of State, Div. of Elections v. Martin*, 916 So. 2d 763, 773 (Fla. 2005).

> "Severability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." *Ray v. Mortham*, 742 So. 2d 1276, 1280 (Fla. 1999). The doctrine of severability is "derived from the respect of the judiciary for the separation of powers, and is 'designed to show great deference to the legislative prerogative to enact laws.'" *Id.* (quoting *Schmitt v. State*, 590 So. 2d 404, 415 (Fla. 1991)).

*Id.* "The severability analysis answers the question of whether 'the taint of an illegal provision has infected the entire enactment, requiring the whole unit to fail.'" *Ray v. Mortham*, 742 So. 2d 1276, 1280 (Fla. 1999) (quoting *Schmitt*, 590 So. 2d at 415), *holding modified by Cook v. City of Jacksonville*, 823 So. 2d 86 (Fla. 2002). Courts must be mindful of legislative intent in determining whether a provision may be severed, and "[i]f the legislative intent . . . cannot be fulfilled absent the unconstitutional provision, the statute as a whole must be declared invalid." *Martin*, 916 So. 2d at 773.

The claim bill provides in pertinent part:

> An act for the relief of Aaron Edwards, a minor, by Lee Memorial Health System of Lee County; providing for an appropriation to compensate Aaron Edwards for damages sustained as a result of medical negligence by employees of Lee Memorial Health System of Lee County; providing a limitation on the payment of fees and costs . . . .
>
> . . . .
>
> The amount paid . . . [is] intended to provide the sole compensation for all present and future claims arising out of the factual situation described in this act which resulted in the injuries suffered by Aaron Edwards. The total amount paid for attorney's fees, lobbying fees, costs, and other similar expenses . . . may not exceed $100,000.

Ch. 2012-249, Laws of Fla.

The language of the claim bill clearly conveys that its sole purpose is to adequately compensate Aaron. Thus, taking into account the intent to redress the wrong committed upon Aaron and his parents'

acknowledgement that their attorneys can be paid without adversely affecting the required rest of life care for Aaron, I would find that the unconstitutional attorneys' fee provision is severable. The remainder of the claim bill which, after the contractual fee deduction, amounts to $11,250,000 does not prevent fulfillment of the remaining (*constitutionally sound*) provisions including the stated legislative purposes of the bill.

## **Conclusion**

The attorneys' fee provision of the claim bill unconstitutionally impairs the pre-existing contract between the Edwards family and the firm. The Edwards family and the firm justifiably relied upon the enactment of section 768.28 when engaging in the solemn right to contract. Although the guardianship court relied on *Gamble* and *Noel* in denying the firm's petition for an award of attorneys' fees, I strongly believe that both *Gamble* and *Noel* are either clearly distinguishable, clearly not applicable, or both. Finally, I would find that the attorneys' fee provision may be severed from the claim bill without frustrating the Legislature's intent to generously compensate Aaron. As a final reminder, I feel compelled to once again state that Aaron's parents—perhaps the two individuals who love him most—have steadfastly insisted that the firm (*their* firm) be compensated for over a decade's worth of legal services and pursuant to a valid, arm's length, and Florida Supreme Court-approved contingency fee agreement *where the result, the risk of which the firm was contractually obligated to assume, could have been zero.*

Bedrock constitutional principles command all of us to closely safeguard the basic right to contract but admittedly provide that a rare exception may exist to permit government to impair a duly executed agreement. If "reasonable and necessary to serve an important public service," an impairment of a contract can withstand the constitutional test we are required to employ.

Here though, no apparent public service was served by obliterating the contract between the Edwards family and their lawyers. The impairment does not pass muster and is, I believe, therefore unconstitutional.

Finally, the attorneys' fee provision of the claim bill unconstitutionally sideswipes an individual's fundamental right to Access to Courts. The Legislature was clearly within its unquestionable prerogative to defer to the courts to render judgment as a condition precedent to invoking the full legislative claim bill process. That, one can argue, makes total sense on many different levels. But the Legislature may not—in the same breath— then restrict, delay, or deny access to the people's judicial process, a

concept firmly rooted in the basics of our beloved democracy.  To do so is unconstitutional.

I would reverse and remand for proceedings consistent with this opinion.

*          *          *

***Not final until disposition of timely filed motion for rehearing.***